I'd like to reserve three minutes for rebuttal, if I may. Okay. Your Honor, this is a retaliation and sexual harassment case where the district court granted summary judgment on both claims predicated on the court making factual findings that credited defendants interested witnesses and basically either ignored or discounted Kellerman's contrary evidence. Well, the retaliation aside, because it seems to me that's your, speaking only for myself, your stronger case. In terms of the harassment case, after this was reported to the supervisor, there was follow-up action taken, there was a suspension, they spoke to Ms. Hemphill. Let's focus for a second on the retaliation claim and help me with the timing of this. What is the statement of the report that you're alleging gave rise to the act of retaliation? The May report, Your Honor. Okay. And in the May report, as the record shows, Mr. Kellerman finally became sort of fed up with what had been going on for a good long while and wrote a pretty detailed letter in addition to providing some of the letters that the alleged harasser provided to both the personnel people and his boss. How long after that? Well, there are two things here. The act of retaliation is self-determination, but in addition to that, from your perspective, the phishing into the omission on the application, how long after the report was written did those two things occur? Sure. The May 17th was when the letter sort of was sent and Mr. Kellerman then met with Sanders, who was the personnel person, on the 20th. I believe it was over a weekend, so it was on a Monday or Tuesday. Sanders then went to read in Naples. On the 26th, we think on the 26th is when they suspended the alleged harasser. So in between those two times is when they went through their files. Both files. Both files. That's correct, Your Honor. Was there any exploration as to why they went through your client's file? Well, Your Honor, they say they don't. They say they do it as a matter of course, although a lot of the evidence in the record is I don't remember, I don't know why I did it, but I did it. There's also some evidence a little later after that that someone, they say someone went to them and told them, oh, by the way, Kellerman didn't work at this other place that he didn't know, but this seems to be after even them going through the records. So the timing, Your Honor, is potentially about 19 days because the letter and the hemp heel suspension were on the 20, between the 17th and 26th, but they began to look at the file in between those time periods. And when did he first disclose to them the employment at the other hospital? Was that in the resume that accompanied the application at the time of the application? Two places, Your Honor. First in the resume, but then also during the interview, and that's what the district court totally ignored. The district court said there's no evidence that they didn't know until May, yet Mr. Kellerman explicitly testified in the interview with the two, with the HR, one HR person and one person from the lab. I told them I worked at Divine Providence Hospital. His resume also showed that, and Your Honor. It also says he handed them the resume. That's correct, Your Honor. And it also makes sense. I mean, not that I have to make sense on a summary judgment record. Well, it's helpful. But it helps. I agree. We grabbed for a little bit, some strands of common sense here and there. Well, I'll throw a crumb, Your Honor. Sometimes we find it, sometimes we don't. Because it makes sense. I mean, here's a person that's applying. They're saying he lists none of his medical experience, and he's applying for a job as a medical lab tech. It makes absolute sense that he's going to discuss that. Why would you hire someone? And from that, everything... It depends. Yeah. Right. Unless the circumstances of his leaving... Exactly. ...were clouded. Remember, it supposedly, the defense says, a employee reported to them because his wife had worked at that other place. Divine Providence. That's in the record. That's the story of the company. Right. The defendant. It was another one of their employees told them, that his wife, and that he had, in effect, walked off the job. That he resigned from the other job. Well, but the statement was a little different than just resigning. Right. It was an implication that he had walked... Walked off in a huff is the implication. For some reason, he had done something wrong when he had walked off. Right. And that was the motive for concealing it. Not, you know, which is contrary to bragging about your experience in another hospital. Right. But the point is, on a summary judgment record, it makes sense that, regardless, the company says he disclosed none of his prior medical experience, or hospital type experience, in his interview. And basically, he submitted an application that said, I worked at Best Buy and Community College and some little medical thing. Not that, I mean, again, I'm not conceding that I have to make sense for purposes of summary judgment. I agree, at trial, I'm really going to have to make sense, but nonetheless, the testimony which the district court just totally ignored is, in the interview, he told them that I was there. And why is that, why that important? I mean, even though there's a lot of implausibility in his story, if you took the whole story of what he filled out in his answer to everybody, there's some implausibility in him handing a file. So he is implausible. Look at the harassment. I'm not going to say that, but nevertheless, your position, if I get it correctly, is that the district court, in effect, resolved a factual dispute, a factual dispute as to whether he ever handed them a resume showing his prior hospital employment at the time of his initial interview. And you're saying there's enough in just his testimony, however implausible it might be, to create an issue of fact that the jury should have been allowed. That's correct, Your Honor. And am I correct that the other fact that, there's another fact that you say, I think you say, in your brief, that he resolved, was his testimony of when he first reported it to management, because the judge found November, but he testified, although it's a little vague, his testimony, it's not exactly a model of clarity, but he says it was July or August of 2003 that he first brought to management's attention the unseemly interest of his co-employee, Ms. Hemphill. That's correct, Your Honor. It was during the summer of 03, and I agree it was July or August, because they don't have the exact dates, but, and what he said was that she's infatuated with me and following me around and sending me things at times. So you're saying that there's a three-month, that he resolved a factual dispute in favor of the testimony of the company employees versus his own testimony. That's correct, Your Honor. Those are really the only two clearly areas where the court, is there any other that where he, you would say he resolved, I mean, the district judge resolved the facts favorably to the defense when there's contrary evidence. Yeah, those are the big ones, Your Honor. I mean, there are some little things, but those are the big ones. When they knew, when the hospital knew, or when he told them, and then also about the prior employment, and then when the hospital had noticed that there was, that he was complaining, that he was being subjected to a, to an unwelcome conduct because of his gender. And in each case, you're saying that his testimony by itself is enough to, even if it's somewhat implausible in some respects in both cases, it's enough to send it to the jury to let the jury decide. Oh, absolutely, Your Honor. This court says repeatedly, the Supreme Court says so in Reeves. Well, there's some issue about what the Supreme Court said in Reeves. I didn't realize that was that big. I'm not sure if this, apparently there's a problem because this pops up in some other cases. Well, Your Honor, it's created sort of a brutal haunt in the Western District because a number of district courts have ended up citing this in the case we're going to talk about next, have cited that for some notion that you don't have to believe an interested, or you have to believe an interested witness. Here we don't have that, quite that problem because there's clearly, You have to disbelieve an interested witness. I'm sorry? You have to disbelieve an interested witness. Right. Correct, Your Honor. I mean, here we have clearly a conflict in the testimony. We have the district court saying they're, the hospital didn't know about it. We have Kellerman saying, yes, they did. I told them in my interview. I sent them a resume. And it becomes a material fact, Your Honor, because if they knew back then and then used it, because the Della Santi case, Your Honor, if they knew about it and suddenly it became important at the time, and that's why no matter what the issue was in, no matter what he was saying, what the jury would believe in his interview, if he told them, their best evidence, Your Honor, is that we don't remember. They don't say, no, it didn't happen. I mean, it's almost as if I've got the only testimony on that because they say, I don't remember. You know, I interview a lot of people. We interview a lot of people. We don't remember what he said, which tells me it's either not important. No, no. But that's unfair to them. They did remember that they discussed his lack of hospital experience. I mean, they did testify that they don't remember him ever giving a resume. But they said, we do remember, at least a couple of them said, not all of them, but a few of them said, we do remember we were concerned about his lack of hospital experience, but we hired him anyhow. Right. So there is some memory there. Okay. It's not completely. Believing them. Okay. But believing me, which I believe the court has to do, he told them. They knew about it. It only became important when he complained. And really, the reason the May thing is important for the retaliation is he didn't more than complain. He gave them a letter. He threatened legal action. I mean, absent that, I mean, because these two things really merge. Absent the retaliation, there's no adverse job action. I mean, that's why I tried to focus you on the retaliation. What's the adverse job action? I mean, usually in these cases, you can find very clearly there is or is not a substantive claim under Title VII, and there is or is not a substantive retaliation claim. But here, you don't really have that because it's the retaliatory dismissal, from your perspective, that gives rise to the adverse job action that you need to support the merits of the Title VII claim. Well, I guess this is one of these odd cases. I agree. The hospital short-circuited it by firing him. That usually doesn't happen in a hostile environment. They end up firing the complainer. But what the adverse action could have been, you know, Ms. Hemphill was suspended. They were going to move them to different departments. The people in Ms. Hemphill's department complained that she was being moved. She went out on a medical leave then for about a month, and by the time she comes back, he's gone. He's been discharged, so we don't know. But ultimately, if Mr. Kellerman is not discharged, perhaps this environment continues on, and that becomes the adverse action, Your Honor. You don't mean that, do you? Well, it doesn't matter. Wait a minute. Let's talk about what's in the case. You're affirming the statement that the only adverse action you are complaining about, and your client is complaining about, is the termination of his employment. That's correct. He was terminated. Are you giving that one up right away? Okay. No, but Your Honor. I'm so slow. Okay. The whole theory of the harassment cause of action, and I personally believe that Chuck, the late Chuck Ritchie in Washington probably invented it, if you go back far enough, but was that the harassment itself, itself, changes the terms and conditions of employment, and therefore is in and of itself a job, an adverse action. That's correct. But he's telling us he's not claiming that. I know. No, Your Honor. I'm claiming it on the Title VII sexual harassment claim. I am, and that's the adverse action. It's the term or condition of employment. It's different for him because of his gender. Are you saying it was pervasive enough that a male of ordinary sensitivity would feel that his conditions of employment had changed by virtue of the alleged harassment? I think that's what basically. Yes, Your Honor. Remember, he's having personal contact. Well, outside the office with her and her husband on at least two occasions, three occasions that I can think of. Well, and Your Honor, I agree that those are facts that favor the defendant, but looking at it from the factual posture of my client, he was receiving these letters, these phone calls, and they're pretty gross and disgusting, at home, at work. She's following him around, and yeah, I do. That's the term or condition of employment. He complains. The hospital warns her. They suspend her, and then the. No, no, please. Mr. Kastner said, Dean Kastner said, make a noise like a lawyer. Okay. The. Kind of like a lawyer to me. Now, with both other judges, Judge Stapleton and Judge McKee asked you, was the harassment, alleged harassment, or her conduct, let's not call it harassment, her conduct in writing the letters and patting him on the back or doing whatever he was doing, was it severe enough in and of itself to send to a jury on the issue as to whether it changed the terms and conditions of his employment adversely? Yes, and Your Honor, I think I've been consistent. It does, because what has happened, it is continuous. This occurred, if Mr. Kellerman is to be believed, it occurred at least from the summer of 2003 up until May of 2004. It affected him. He's testified that I was becoming upset about it. I didn't want to go to work, et cetera. The fact that they met with the husband on occasion or two, I agree, is a fact that favors the defendants, but it's a fact that it's an inference that for purposes of summary judgment, and that's where we are, Your Honor, that evidence is not even to be given credit. Believe it, believe it if you will or not, the point is that is the conduct consistent enough? They haven't alleged that it was consensual. In fact, the hospital itself, when they saw the letter, said, oh my God, the May 14th letter, the hospital punished Ms. Hemphill. Now, they say they don't know if she was punished herself. No, they said they punished her because she disregarded a prior order. It was a prior order to her, that I don't think is disputed, that she not contact him or write him letters or follow him around, something like that. And she was specifically, they specifically did not make a sexual harassment finding. They merely said she disobeyed a direct order that was previously, it was really a form of insubordination. So what should they have done on the merits of the claim? They've got this policy in place. She was subjected to the sanction that we discussed, transferred to a different department, which I know you may not be content with, but may well satisfy their obligation to issue the complaint. What should they have done? I think what they should have done was warn her that, first off, they should have investigated, after they had that letter, they should have investigated and told her. They called her in, they spoke with her? Well, they spoke with her, but if you believe in the hospital, it was just because she was being insubordinate, because she called him at home. There's conduct in these letters, Your Honor, that I think any reasonable person would believe is sexual in nature. But what should they have done about it? Well, they should have told her that this is a sexual harassment issue, you're not to do it, you're being suspended, and warned her if she does it again. So they did the right thing for the wrong reason? They suspended her, but for the insubordination as opposed to the harassment? Unfortunately, in employment law, the right thing for the wrong reason often becomes important, Your Honor. And what they then did was they fired Mr. Kellerman. Now, their duty is to both stop the sexual harassment and have it not happen in the future to deter that conduct. And this conduct, they didn't complete the investigation, and they fired him, and there is no deterrent effect whatsoever in this. This is an odd situation, because the conduct stopped because Mr. Kellerman was fired. And I can't believe, we're not in the situation where there was a supervisor involved, but if there was a supervisor involved, the employer is automatically liable for that because of the discharge. I think we understand your position, but unfortunately, I'm confused, and so we're going to have to go back here. You talked about the second important issue as to which there is a material dispute of fact being when the employer should have realized that this was a gender-based problem. And in the course of the discussion, it was suggested that the district court found that the employer realized it in November. I thought the district court said the employer didn't recognize it until May, and that was all right. I mean, that they were reasonable in not so recognizing it. What did the district court say? The district court said that in November, the employer only believed that she was bothering. I think this is the term the district court used, that she was bothering Mr. Kellerman. The record shows that by that point, Mr. Kellerman had told him that she was following him around. She was infatuated with him. Okay, you don't need to argue that point. I think there may be a material dispute of fact about whether they should have known in November. The follow-up question is, you've now said you, it's not just the termination you're complaining about. You want, your client wants damages for a condition that existed with respect to the conditions of his employment. Now, during what period of time are you, does that claim cover? It covers at a minimum. I mean, the testimony from my client is he told him during the summer of 2003. So the minimum during that period until May. So about 8, 9, 10 months period. The employer is alleging it's November. I'm not accepting that for purposes of the factual dispute, Your Honor. I think for purposes of what the employer is saying is they knew in November. That's what the district court found. But there's evidence in the record. They did, assuming you're right, that a jury could find here that the employer should have realized what was going on here in November. They did verbally tell her to lay off. Well, they told her don't bother him at home. Okay. They didn't do anything beyond that. I don't think that was prompt or effective, Your Honor, especially given that he told, Mr. Kellerman told them in the summer. The November, the district court's November is wrong. I agree, I agree. His testimony would have meant at that point, six months. That's right. They should have been bothering this, enduring this. And now they certainly should know that it's gender based. But they said, stop it. And it didn't stop. And it didn't stop. And did he go to, did he, pardon me, but let me just follow up. They said, stop it. She didn't stop it. And did your client go back and say she hadn't stopped it? Yeah, he went back. He complained also in April. So there's a time period. I mean, if he would have, if he had gone to them every week, they would have been complaining, well, you're just, you know, you're just, you're just complaining because you're complaining. The time periods that I think is pretty much agreement is summer, November, April. And then he gave them the specific letters. I mean, he gave them the letters right away because that's where you really, even the least offensive of the letters. He used the word sweetie. He waited quite a while, didn't he, before he turned the letters over? He was telling them though. And I guess, no, there is no good explanation for why he maybe should have given them the letters earlier. But the point is, this was an ongoing situation. And they were on notice that there's a person that's infatuated with him that's following him around. And when he gave him the letters, maybe he figured what happened and said, look what happened. But he was telling them, he was making progress. He didn't do it all at once, but he was telling them during the period. Thank you for your argument. Why don't we hear from Ms. Is it Feldstein or Feldstein? It's Feldstein. Good morning. My name is Allison Feldstein. May it please the court. I'm representing UPMC St. Margaret in this case. Ms. Feldstein, how can this possibly be a case for summary judgment? How can there not be a material issue of fact, at least as to the retaliation claim? I'm not, speaking only for myself, I'm not overwhelmed by the merits of the Title VII claim for a number of reasons. But he may be right about that. But forget that. How can we possibly conclude that there's not an issue of fact about why they discharged him? You're saying, we discharged the guy. We took an action. We had every right to take. He knew when he signed the job application, we require all prior employment to be on the job application. He admits he omitted the prior hospital employment. That gives us grounds to fire him. He's got to admit that we have grounds to fire him. And he is saying, that's not why they fired me. They knew about my omission from day one. I told them during the job interview. They had my resume. They didn't find that was important until after I started complaining about the harassment. I wrote letters. I complained about this to my boss. In addition to that, not only do they terminate me, before they do it, they start fishing around in my personnel file. So I go and make a complaint about my employee, my co-employee X. They don't look at co-employee X's file. They look at her file. They look at my file. He would argue the jury. The very fact that I go and complain and they investigate me as the complainer would substantiate a finding that I was fired because I was complaining. Get this troublemaker out of here. We don't want him around anymore. How can there not be an issue of fact given that scenario? Am I misreading the record? The plaintiff has an obligation to make out a prima facie case of retaliation. So he has to be able to establish at summary judgment a prima facie case that he engaged in protected activity. You agree that he did? No, we don't agree that he did. In fact, we raised that with the district court. The district court didn't get to that argument. Him complaining to the supervisor about harassment is not protected activity? Well, in order to establish protected activity, he had to be harassed or that a violation of Title VII was occurring and that his belief was objectively reasonable in light of all the circumstances. You're arguing that basically it takes two to tango and she had some information in those letters that she could only have gotten from him and therefore there's no good faith belief and therefore no retaliation. Yeah, and not only that, Your Honor. If you really look at the record in this case, there's only one incident where alleged harassment consists of statements like, for example, and this is cited in our brief, I have to go to bed because I have to get up early for church in the morning. Plaintiff testified he found that comment to be offensive and sexually harassing because the plaintiff, I'm sorry, Ms. Hemphill was stating describing herself going to bed. These are the types of statements that form the conduct that the plaintiff is alleging and these two letters spruced up what would otherwise be a pretty mundane sitting. At least one. That's a great way. It's true. One of the letters. It's an insurance contract we got coming later in the week. This is much more interesting. Truthfully, the September 2003 letter was sexually explicit and we're not denying that but as it goes to the harassment claim, the plaintiff needs to be able to do severe or pervasive and regular harassment. It's our position that one letter with sexually explicit content in it is not the type of conduct that rises to the level of the severe or pervasive harassment that's required by the law. What about the August 14th letter? The August 14th letter, I don't believe contains sexually explicit material. Everybody in this courtroom is saying read the letter, read the letter. It's underlined. Okay. I'm sorry, Your Honor. I believe that is the letter then. That is the one letter then. It's underlined several times. He obviously read this letter more than once. Yeah. The letters did stop. The evidence in this case is very clear that the letters stopped in September of 2003. At no point between September 2003 and May of 2004 when he launched his formal complaint to Human Resources were there any more of these types of letters being addressed. I'll never give you a back rub again. I was just trying to help. I'm not denying that that's contained in that letter. That refers to prior conduct. That refers to prior conduct. And remember, the record is also very clear at least with respect to the complaints. And this is where the district judge went in terms of the responding out superior liability here. The evidence is clear that at no point in time prior to May of 2004 did the plaintiff state that Ms. Hemphill was engaging in this conduct because of his sex. He needs to put the defendant on notice. Wait a minute. Wait a minute. There's no material dispute of fact as to whether the employer as of November should have known that this was a gender-based problem despite the fact that he told them that she was infatuated with him, that when he was at work she continually invaded his space when she spoke to him, that there were rumors he was concerned because all the people in the office were talking about this relationship and their opposite sex and she's bugging him all night and day. There's no material dispute of fact as to whether they should have said, well, maybe this has something to do with the sex. Do you think maybe if this case involved would have come out differently if the sexes were reversed? I really don't, Your Honor. And with respect to the infatuation comment, I'd like the record to be very clear here that I repeatedly questioned the plaintiff in his deposition as to what exactly he informed Human Resources and his supervisors when he made his November complaint. After repeated prodding, he finally stated, you know, how she was infatuated with me and stuff. In the entire two-volume record that's before this Court, that's the only time the word infatuation is mentioned. And from that, the plaintiff has basically alleged in his brief that, therefore, that statement in and of itself put them on notice that she was basically romantically in love with him and wanted to engage in sexual contact with him. I don't think that's enough and I don't think that the record really supports that that's what was discussed during each of those meetings. The other thing... Can I go back to the reversal of roles? Sure. I'm reading a letter of July 30th and he talks about kissing and squeezing. Let's assume you have the roles reversed and there was this type of touching that was going on here, back rub, squeezing, I mean, physical contact. Now, granted, not of the most severe kind. I mean, I just think that most courts would look very askance at somebody giving, if I went up to, when I say I, a male went up to a woman, a co-employee, and started giving her a back rub or squeezing her arm or referring to her as sweetie. This letter begins, hey, sweetie. Honey, which is another reference in this letter, and this is one of the more benign letters. It refers to her as sweetheart. Sweetheart, honey, I'll be getting enough rest, honey, and, you know, I think she even says, I hope you don't find my touching you to be offensive. And I absolutely agree. If this were reversed and there was a man touching a woman, even in, not in the worst possible ways, I think that, I think most, nobody would be talking about somebody's judgment. The only question is, how much do you want to settle for before we go to the jury? The standard for sexual harassment, the standard for severe or pervasive harassment is the same regardless as to whether or not the alleged victim's a male or female. That's exactly Judge Durant's point and Judge Tabor's point. If that's exactly your point in saying this, I can let counsel know that we're not taking this lightly even though there's been some chuckling over what went on. I don't mind us suggesting, Mr. Corey, that we're not taking this claim seriously. And the point that's been made is a very, very good one. If you take this, reverse it, and you have a female alleging this conduct coming from a male employee, it seems like Judge Reynolds is right. If they open up the checkbook, what can we agree on? However, Your Honor, with respect, that goes to the severe or pervasive and regular piece of it. He also needs to establish that we knew or should have known that this harassment... The quality of the conduct. You're saying, look, it's only a back rub. And implicit in that, look, it's a woman saying that to a male. And I guess you could then argue that the ordinary employee, i.e. male employee in the plainer circumstance would not have been offended by that. But doesn't he have a... If he doesn't want that touching, he doesn't have to be subjected to it just because he happens to have to work on his health. And that's Title VII. That is Title VII. And the truth of the matter is that throughout this entire period of time there were two attempts at back rubs. He told her not to do it and she didn't do it. That coupled with all of this other stuff that's in there was really not sexually charged behavior. But even so... Well, it's not sexually... Assuming it's not sexually charged behavior, and it may not be, but that's not the test under Title VII. It's harassment behavior. Why? Why wouldn't there at least be an issue of fact? You may be right on the merits of the claim. It may not, as a matter of fact, be even harassing behavior, let alone sexually charged behavior. But why isn't there at least an issue of fact in a number of them? One, which was mentioned to you, whether or not this conduct, assuming that he can prove it, I've never found it to be evidence, whether or not a reasonable person in the plaintiff's situation would have been... found that offensive. And that might get to a very legal, very interesting legal issue about the gender. Because the test is whether or not a person in that, or an employee in that situation, without putting the gender in there, if the test were to be whether or not a reasonable, the ordinary reasonable male employee would have felt harassed. That's a different issue and I don't know where the court would come out on that one. Us or the Supreme Court. I don't think it's ever been looked at. But step back and look at it as both my colleagues are suggesting, that we don't look at this as a woman pursuing a man and therefore, it's not such a big deal, but as an employee engaging arguably in conduct that is prohibited by Title VII and whether or not he should have the right to argue that to the jury. And then the retaliation plan on top of that. Now I don't, given the letters that you've heard, it seems to me to have a hard time arguing to the jury that if that was a man sending that letter to a female employee, that there's no Title VII cause of action there. Well, and in addition, I mean the judge in this case, the district court found not on that issue but on the respondeat superior issue. In other words, what did the employer know and what prompt remedial action did the employer take once it had knowledge? Now certainly, I've asserted and as I've explained to the court, we don't believe there's any evidence in the record establishing that the defendant knew the conduct, the alleged conduct was sexual in nature until plaintiff made that complaint in May. However, the evidence is also clear that once plaintiff complained... You have to intend to harass, is that the test? Excuse me? Is that the test that plaintiff has to show the subjective intent to harass? The subjective intent to harass? No. So if an employee, if a female, if a male employee sends a very objectively offensive letter to a female, if a male employee sends that kind of letter to a female employee but argues, I didn't really mean anything by it, I didn't mean anything by it, I didn't mean anything bad by it, could you imagine us saying that's a legitimate defense under Channel 7? And I don't believe that's what I've represented. I think what I'm saying, Your Honor, is that the employer, the supervisors who plaintiff allegedly, he claims he's been reporting this conduct throughout his employment, there's an issue as to what the employer knew. Actually, there's no issue. One of those Freudian slips, there's no issue as to what the employer knew. I don't want to bring Freud into this. You sound like a Freudian slip. But, in any event, once they found out that there was this problem, they did take action. And the record is undisputed that in November 2003, Trudy Hemphill received a warning. She was told no contact with the plaintiff other than business related contact at work. The evidence is also undisputed that following this warning to Ms. Hemphill that her supervisor, that plaintiff's supervisor checked in with him and asked him, how are things going? Is everything okay? And he said they were fine. It wasn't until April of 2004 that he came forward again with another email that he had sent to Ms. Hemphill saying, look, basically, I don't want to be friends anymore. I appreciate your concerns, but, you know, it's in our best interest not to have this friendship. At that point in time, it then came to management's attention again. Now, between April and May, when he finally decided to complain about sexual harassment, there were no incidents. There were two alleged voicemail messages or telephone calls to him on April 29th that he didn't report until May. So, there's no evidence in the record that between, you know, his early 2003 complaints and this May 2004 complaint that there was nothing done. The employer did what it was obligated to do under the law, which is make an attempt to correct, promptly correct any alleged harassment conduct. Let's wind up where we started off and switch to the retaliation claim for a moment. And, let me, he, he, on May 14th, he turns these letters over, he says, I'm being sexually harassed and I'm talking to my lawyer, lawyers, about bringing a lawsuit. And, on June 12th, he was terminated. And, there appears to be a material dispute of fact as to whether the employer says the reason he was terminated was the failure to disclose the prior employment. But, there is a material dispute of fact as to whether the employer knew about that, Ms. Reed in particular, who interviewed him. Why is that not a problem  judgment-wise? Well, I don't think it's a problem for a couple reasons. First of all, there's no evidence in the record that Ms. Reed knew about the omission on the employment application. All that's in the record, taking all the facts in the light most favorable to plaintiff, is that during his interview, he allegedly presented her with a resume. There's no evidence that she sat and compared that resume to see where he worked at Divine Providence with the employment application. He testified that he told her. He testified that he told her. That's evidence. But, there's no evidence that she recognized that this was not on the employment application. You're saying he told her, yeah, I work at this other hospital. He did not tell her. I told her I was a lawyer. That, since 2003, he'd been complaining about sexual harassment. Complaining and complaining from the beginning of his employment all the way until the end of his employment. What he's trying  for purposes of his retaliation claim is create this very short window between the May 14th complaint and his termination. Well, because that's when he mentioned lawyer. May 14th is when he said I've got to go to my lawyer about this. But, your position is exactly, your argument that on the straight Title 7 claim, as an employer, you really didn't know until May that there was such a claim. You were very vigorous in that point, that really until May, you don't really know as an employer. But, doesn't that cut against your argument on the retaliation claim? Because it is complaining about sexual harassment, not just nudging. And, then suddenly within a month he's fired. Doesn't that, doesn't one position in effect catch you on the other position? I understand your point, Your Honor. But, our position is that regardless of whether we knew, we took appropriate action to promptly correct and stop harassment in August, in November. So, the employer met its obligation under the law in that regard, regardless of whether or not it knew. Okay. Thank you. Thank you. Your Honor, to just address one thing Ms. Felsen said, the, on a summary judgment record, I get the benefit of a reasonable jury could assume that if you tell someone in a job interview that I worked at a place, in a job interview, an employer is going to have your application there. So, I think that, you know, I agree that Ms. Felsen can argue that at trial, that you wouldn't have the application during the interview, but I think I get the benefit of that inference at a minimum on a summary judgment. Your Honor, this notion in the Title VII in the hostile environment claim that there was no sort of, this was hinted about, is sort of belied by the record. The, they, Kellerman complained about being infatuated getting letters in the middle of the night. He shared his information with the lab manager. The lab manager said it's none of my business. He then, for two weeks, they warned him, for two weeks she stops it. Soon after she resumes with the letters. One particular letter is the letter that we've been banting about here. He complained on November 3rd. He complained in April. They did nothing. They did nothing between April and May at all. An entire month passes where Ms. Hemphill showed the email. So there's an entire month where nothing's done. And you can't, we could cherry pick these pieces of evidence and say, well, this one doesn't make a big deal. But you've got to look at the entire picture. This court has been repeated in saying that. The things that happened in April are the end result of what happened in August. So to take August and separate it and say, well, that was August and that doesn't matter because now this is April. But August is followed by November, is followed by, I'm giving the calendar, but I think the court understands. The issue is you've got to look at the entire picture of what happened. And all this stuff was going on. And finally, it culminates in May when he's had it enough. And he said, well, here, look at this. You're not obviously telling you that she's bothering you and doesn't do enough. Here's the explicit letters. Now, look what happened. He's gone. You know, I think, I'm not asking the court in any way to say who wins in this case, but I think there's plenty of evidence of retaliation to get to a jury. And I also think there's plenty of evidence looking at the case as an entire picture to get to a jury on the issue of whether there is a hostile environment. If the court has no further questions, I think that's  going to do   close the hearing. I have no other questions. I have nothing else. I'm content. Thank you, Ron. Thank you.     I think it's just about a brief five-minute break before we go back to the hearing. Thank you. Thank you. Thank you, Ron.